4 Cal.App.3d 463 (1970)
84 Cal. Rptr. 846

[*]LA VERN H. ALBERS, Plaintiff and Appellant,
v.
GREYHOUND CORPORATION et al., Defendant and Respondent.
Docket No. 24803.
Court of Appeals of California, First District, Division One.
February 18, 1970.
*466 COUNSEL
Lyons & Morgan, David Jay Morgan and Richard G. Logan for Plaintiff and Appellant.
Kane, Thrasher & Galligan and Cyril Viadro for Defendant and Respondent.
*467 OPINION
SIMS, J.
Plaintiff has appealed from a judgment of nonsuit granted the defendant, The Greyhound Corporation, in an action in which he sought to recover damages for such personal injuries as he suffered when a heavy package consigned by the defendant Gehrke[1] to The Greyhound Corporation for shipment to plaintiff broke shortly following its delivery to him by the carrier. Plaintiff contends that the trial court erred in granting a nonsuit because the evidence offered on his behalf was sufficient to sustain a verdict in his favor either under the doctrine of res ipsa loquitur, or, independently of that doctrine, for negligence of the carrier in accepting an improperly packaged item or in mishandling the package.
"The rules applicable to appeals from nonsuits are well settled.
(1) "`[A] nonsuit may be granted "... `only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.'"' (Meyer v. Blackman, 59 Cal.2d 668, 671 ...) A legitimate inference, of course, must be founded `On a fact legally proved.' (Code Civ. Proc., § 1960.) (2) While the use of a nonsuit is a procedural device of great value when appropriately utilized, it may not be used to deprive a litigant of his right to have his case decided by the jury when under the evidence, and the inferences permissible therefrom, a verdict in his favor could reasonably be returned. In this light, we must examine the evidence here involved." (Kopfinger v. Grand Central Public Market (1964) 60 Cal.2d 852, 854-855 [37 Cal. Rptr. 65, 389 P.2d 529]. See also, Quintal v. Laurel Grove Hospital (1964) 62 Cal.2d 154, 159 [41 Cal. Rptr. 577, 397 P.2d 161]; Fowler v. Seaton (1964) 61 Cal.2d 681, 683 [39 Cal. Rptr. 881, 394 P.2d 697]; Seneris v. Haas (1955) 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124]; Gherna v. Ford Motor Co. (1966) 246 Cal. App.2d 639, 646 and 649 [55 Cal. Rptr. 94]; Crawford v. County of Sacramento (1966) 239 Cal. App.2d 791, 797 [49 Cal. Rptr. 115]; Greening v. General Air-Conditioning Corp. (1965) 233 Cal. App.2d 545, 553 [43 Cal. Rptr. 662]; Reynolds v. Natural Gas Equipment, Inc. (1960) 184 Cal. App.2d 724, 731 and 735 [7 Cal. Rptr. 879]; and Biondini v. Amship Corp. (1947) 81 Cal. App.2d 751, 754 [185 P.2d 94].)

*468 The Evidence

The record shows that sometime during the week ending Saturday, April 18, 1964, the plaintiff, who operated a manufacturing jobbing machine shop in San Mateo, sent two 12-inch in diameter milling cutters which weighed about 20 pounds each, to Gehrke's industrial grinding company in Santa Clara for resharpening. Plaintiff could not recall in what manner the cutters were delivered to Gehrke on this occasion.
Gehrke had been servicing the plaintiff's milling cutters for several years prior to the incident in question. The cutters involved in this action were one pair of two or more sets which the plaintiff had been using for eight or nine months in connection with the performance of a contract with the United States Army. It was the practice to send one of these sets of cutters to Gehrke for resharpening once or twice a week. Sometimes the cutters would be delivered to Gehrke or be picked up by plaintiff or one of his employees and be transported lying open in the back of a pickup truck; sometimes Gehrke would pick them up or return them and transport them in a similar manner; and sometimes they would be shipped by Greyhound bus.
Plaintiff had not discussed with Gehrke the use of any type of container to hold the cutters. He did not know of any box specially manufactured by his employees for the purpose of shipping the cutters. He acknowledged there were boxes lying around from supplies and materials coming into his plant. Testimony was offered to show that packages originating in the plaintiff's plant would ordinarily be strapped with steel strapping.
According to Gehrke the cutters were generally received in a wooden container. They could have been brought in on occasions after transportation in the back of plaintiff's truck without a container, but he was sure that they were not shipped more than once or twice without being in a wooden container. Gehrke acknowledged that there were occasions in which the cutters had been transported without a top on the container. He recalled that the plaintiff himself had brought the cutters to his plant on the Tuesday preceding the accident. Acording to Gehrke they were sharpened and placed in the same container in which they came.
From the testimony of the plaintiff, of the station agent from whom he received the box, and of Gehrke, who shipped it, it appears that this box had the following characteristics: It was made of pieces of 3/4-inch thick wood secured together by 2-inch nails; four of its six sides were approximately 5 inches by 12 inches, and the remaining two sides were about 12 inches by 12 inches. According to the plaintiff and Gehrke it had cleats on two sides near the top to make a handhold. Apparently, before the waybill *469 was affixed, there was visible a designation of "Top" on that side  the 5" x 12" side which was above the cleats. The station agent did not observe the cleats and considered the two 12" x 12" sides as the top and the bottom of the box. There was no metal strapping, wire, rope or tape around the box.
Gehrke took the loaded box in a truck to the Greyhound station in Santa Clara for shipment. A waybill indicated that a 57-pound package directed to the plaintiff was received at that station at 5:45 p.m. on April 16, 1964. Gehrke inspected the box visually to be sure it was properly together before he picked it up and carried it to his truck. It appeared to be in good condition at that time, and, as well, when he left it at the bus station. In carrying the box he carried it by the handles. There was no strapping on the box. Gehrke acknowledged that metal strapping would have made the box more secure.
There were no records kept or available to show on which particular bus or busses the box was transported, or the specific employees who were involved in handling it. An employee of the bus company testified that in all probability the package would have been transported into San Jose on a bus without special facilities for baggage; that there it would have been transferred to a through bus from San Jose to San Francisco; and that finally it would have been placed on a third bus from San Francisco to San Mateo. In a bus without a separate baggage compartment under the seats, baggage and shipments may be carried on an overhead rack, on a seat, or on the floor by the driver.
The San Mateo station agent testified that he took the package out of the lower level of the baggage compartment of a bus which arrived from San Francisco at 10:15 a.m. on April 18th, carried it into the express room and placed it on a shelf. The box looked intact, and he did not turn it over or see if any portion of the box was coming apart. He slid the box in the bus to where he could get his hands on it, carried it against him with one of the 12 x 12-inch sides facing the floor and placed it on the shelf so that it rested on that side. He did not remember seeing any handles on the box, nor did he know of any designation on the box indicating which was the top or the bottom. He noticed the waybill fastened to one of the smaller sides which he described as "one of the ends" of the box.
That morning the plaintiff received a telephone call notifying him that a package from Santa Clara had been received at the San Mateo bus station. He drove down in a pickup truck, parked across the street from the station driveway, went to the ticket office and paid the freight charges. He was directed outside to the door of the freight office to receive the package. Meanwhile, the station agent, without inspecting the box, removed it from *470 the shelf and took it to the doorway of the freight office. He could not remember whether he handed it to the plaintiff or set it on the floor.
The plaintiff testified that he found the box sitting on the door sill with the handles and a 5 x 12-inch side bearing the waybill on top. He knew that the cutters were in the box, and having handled them before, he was aware they were heavy. He picked up the box, held it right in front of himself, close to his body, and walked away. Nothing unusual occurred while he was picking up the box, nor was there anything unusual about the way he was carrying the box. Plaintiff felt quite comfortable. He did not bang into anything with the box or drop it. Nothing came in contact with the box and he had no notice that it was going to come apart.
After the plaintiff had taken four or five steps (the station agent identified a point 15 feet from the freight office door where the cutters chipped the driveway), the box suddenly fell apart. The plaintiff was thrown off balance, and made an exaggerated but unsuccessful movement to get away from the cutters. One of the cutters struck him and cut open his right thigh. He subsequently observed in picking up the pieces, that one 12 x 12-inch side of the box had broken away with the bottom 5 x 12-inch side, and that the whole box was pulled apart in three or four pieces.
The plaintiff picked up the cutters one at a time, and then the pieces of the box, and put them inside the door of the freight office. He told the station agent the box had fallen apart and that he had been injured.
The station agent observed that one of the smaller sides had come off the end of the box and had the nails still in it, and that the nails, which were about two inches long, were not heavy nails. He testified that the nails were not as heavy as he thought they should be for a package of that size or weight and that it was evident that one of the ends had come off and the cutters had slid out the end down to the pavement. He told the plaintiff, "Gee, that should have been nailed better than that with all that weight in it"; and that it should have been packaged better than that and should have had metal straps around it to hold the heavy contents.
The station agent told the plaintiff that he should see a doctor before infection set in. The plaintiff went to the doctor and subsequently returned, picked up the cutters and put them in his pickup truck. He did not see the pieces of the box and made no attempt to find them. He never saw the box again.
Plaintiff seeks recovery not only for the wound inflicted by the cutters, but also for a disabling condition resulting from a hernia and other complications.

*471 Res Ipsa Loquitur

(3) "Res ipsa loquitur, when translated, `means simply "the thing, or affair, speaks for itself," and, so speaking, authorized the inference of negligence in the absence of a showing to the contrary.' (O'Connor v. Mennie, 169 Cal. 217, 223....) There is, of course, no magic in the Latin phrase, ..." (Zentz v. Coca Cola Bottling Co. (1952) 39 Cal.2d 436, 440 [247 P.2d 344]. See also, Seeley v. Combs (1966) 65 Cal.2d 127, 130 [52 Cal. Rptr. 578, 416 P.2d 810].)
(4) "The doctrine of res ipsa loquitur has three conditions: `(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' (Prosser, Torts, p. 295.)" (Ybarra v. Spangard (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]. See also, Seeley v. Combs, supra, 65 Cal.2d 127, 133; Shahinian v. McCormick (1963) 59 Cal.2d 554, 559 [30 Cal. Rptr. 521, 381 P.2d 377]; Wolfsmith v. Marsh (1959) 51 Cal.2d 832, 835 [337 P.2d 70]; Seneris v. Haas, supra, 45 Cal.2d 811, 823; Casetta v. United States Rubber Co. (1968) 260 Cal. App.2d 792, 809 [67 Cal. Rptr. 645]; Gherna v. Ford Motor Co., supra, 246 Cal. App.2d 639, 647; Hansen v. Matich Corp. (1965) 234 Cal. App.2d 129, 132 [44 Cal. Rptr. 149]; Exploration Drilling Co. v. Heavy Transport, Inc. (1963) 220 Cal. App.2d 397, 403 [33 Cal. Rptr. 747]; Reynolds v. Natural Gas Equipment, Inc. (1960) 184 Cal. App.2d 724, 731 [7 Cal. Rptr. 879]; Adam v. Los Angeles Transit Lines (1957) 154 Cal. App.2d 535, 538-539 [317 P.2d 642]; Keller v. Morrison-Knudsen Co., Inc. (1957) 149 Cal. App.2d 205, 210 [308 P.2d 370]; and Baker v. B.F. Goodrich Co. (1953) 115 Cal. App.2d 221, 226 [252 P.2d 24].)
(5a) The mere fact that the box was in the custody and control of the plaintiff at the time the accident occurred does not prevent the application of the doctrine. (6) "The fact that an accident occurs after the defendant relinquishes control of the instrumentality which causes the accident does not preclude application of the doctrine provided there is evidence that the instrumentality had not been improperly handled or its condition otherwise changed after control was relinquished by the defendant. (Zentz v. Coca Cola Bottling Co., 39 Cal.2d 436, 444 ...)" (Burr v. Sherwin Williams Co. (1954) 42 Cal.2d 682, 687 [268 P.2d 1041]. See also, Shahinian v. McCormick, supra, 59 Cal.2d 554, 560; Burr, supra, pp. 687-688; Rose v. Melody Lane (1952) 39 Cal.2d 481, 486-487 [247 P.2d 335]; Casetta v. United States Rubber Co., supra, 260 Cal. App.2d 792, 810; Gherna v. Ford Motor Co., supra, 246 Cal. App.2d 639, 648; Exploration Drilling Co. v. Heavy *472 Transport, Inc., supra, 220 Cal. App.2d 397, 404; Reynolds v. Natural Gas Equipment, Inc., supra, 184 Cal. App.2d 724, 732-735; Fields v. City of Oakland (1955) 137 Cal. App.2d 602, 607-608 [291 P.2d 145]; and Baker v. B.F. Goodrich Co., supra, 115 Cal. App.2d 221, 226-229.) (5b) There is nothing in the evidence to indicate that plaintiff mishandled the box in the brief interval commencing with the time he picked it up and culminating a few steps away in the accident.[2]
The controversy resolves about the application and juxtaposition of the first two conditions which are necessary to support the inference of negligence. It is obvious that a box used for shipment generally does not fall apart unless someone has been negligent. (Cf. Di Mare v. Cresci (1962) 58 Cal.2d 292, 299-300 [23 Cal. Rptr. 772, 373 P.2d 860] [collapsing step]; Rose v. Melody Lane, supra, 39 Cal.2d 481, 486 [collapsing bar stool]; Zentz v. Coca Cola Bottling Co., supra, 39 Cal.2d 436, 447 [exploding bottle]; Casetta v. United States Rubber Co., supra, 260 Cal. App.2d 792, 809-810 [exploding tire]; Gherna v. Ford Motor Co., supra, 246 Cal. App.2d 639, 647 [fire in new car]; Exploration Drilling Co. v. Heavy Transport, Inc., supra, 220 Cal. App.2d 397, 403 [fire from wheel of semi-trailer]; Adam v. Los Angeles Transit Lines, supra, 154 Cal. App.2d 535, 539 [collapsing streetcar seat]; Fields v. City of Oakland (1955) 137 Cal. App.2d 602, 608 [291 P.2d 145] [falling light fixture]; Baker v. B.F. Goodrich Co., supra, 115 Cal. App.2d 221, 226 [exploding tire]; Biondini v. Amship Corp., supra, 81 Cal. App.2d 751, 767 [collapsing scaffold].) The box unquestionably was within the exclusive control of the carrier from the time it was received at its Santa Clara station, until it was delivered to the plaintiff over 36 hours later at San Mateo after a circuitous journey. Nevertheless, the plaintiff must establish not only these elements, but also, that "the accident was of such a nature that the injury was more probably than not the result of the defendant's negligence." (Zentz v. Coca Cola Bottling Co., supra, 39 Cal.2d 436, 447, italics added. See also, Quintal v. Laurel Grove Hospital, supra, 62 Cal.2d 154, 164; Shahinian v. McCormick, supra, 59 Cal.2d 554, 559; Di Mare v. Cresci, supra, 58 Cal.2d 292, 298-299; Borenkraut v. Whitten (1961) 56 Cal.2d 538, 547 [15 Cal. Rptr. 635, 364 P.2d 467]; Guerra v. Handlery Hotels, Inc. (1959) 53 Cal.2d 266, 271 [1 Cal. Rptr. *473 330, 347 P.2d 674]; LaPorte v. Houston (1948) 33 Cal.2d 167, 169-170 [199 P.2d 665]; Casetta v. United States Rubber Co., supra, 260 Cal. App.2d 792, 814; Exploration Drilling Co. v. Heavy Transport, Inc., supra, 220 Cal. App.2d 397, 403-404; Fields v. City of Oakland, supra, 137 Cal. App.2d 602, 608; Baker v. B.F. Goodrich Co., supra, 115 Cal. App.2d 221, 231; and cf. Hernandez v. Southern Cal. Gas Co. (1931) 213 Cal. 384, 387-388 [2 P.2d 360].)
In Rose v. Melody Lane, supra, the court noted, "Seats designed for use by patrons of commercial establishments do not ordinarily collapse without negligence in their construction, maintenance, or use." (39 Cal.2d at p. 486.) So here the box may have collapsed because of negligent construction, negligent maintenance (in inspecting, loading, unloading, or storing the box), or negligent use through mishandling by the carrier. The evidence introduced by plaintiff showed that the box was in apparent good order when it was loaded and delivered to the carrier at Santa Clara; and that at that time the bottom supported the weight of the cutters when the box was carried by the handles. The evidence showed that regulations promulgated by the carrier and approved by the Public Utilities Commission (see discussion below) permitted the carrier to refuse to accept improperly packaged articles. The agent at the point of delivery, in carrying the box on its side, which he erroneously believed was the bottom, did not have an opportunity to test the weight-bearing capacity of the bottom of the box. The fact that when it was first exposed to the weight of the cutters after delivery it broke apart permits the inference that the box was mishandled in treatment so that the true bottom lost its bearing capacity.
The testimony of the station agent tended to show that the negligence was in the construction of the box. (7) "The introduction of evidence of specific acts of negligence does not deprive the plaintiff of the benefit of the doctrine unless the facts as to the cause of the accident and the care exercised by the defendant are shown as a matter of law thus eliminating any justification for resort to the inference of negligence. [Citations.]" (Di Mare v. Cresci, supra, 58 Cal.2d 292, 299. See also, Seeley v. Combs, supra, 65 Cal.2d 127, 134; and Borenkraut v. Whitten, supra, 56 Cal.2d 538, 548; but cf. Akins v. County of Sonoma (1967) 67 Cal.2d 185, 195 [60 Cal. Rptr. 499, 430 P.2d 57]; and Keeton v. Henning (1969) 1 Cal. App.3d 50, 54-55 [81 Cal. Rptr. 424].)
(5c) The testimony concerning the weakness in the construction of the box, and the failure to secure it with metal strapping, did not establish those acts and omissions as the only cause of the collapse of the box as a matter of law. That testimony should be weighed against the fact the box was delivered to and received by the carrier in a condition where it bore the *474 weight of the cutters. "The record thus establishes a situation in which the application of the res ipsa loquitur doctrine would depend on which facts the jury believed." (See, Exploration Drilling Co. v. Heavy Transport, Inc., supra, 220 Cal. App.2d at p. 403; and Baker v. B.F. Goodrich Co., supra, 115 Cal. App.2d 221, 229.) The alleged negligent acts and omissions of those who constructed the box (be it the plaintiff or another, see fn. 2 above), packed it and delivered it to the carrier, could be eliminated as a proximate cause of the collapse of the box because of its ostensible fitness for the purpose for which it was used up to the time it was delivered to the carrier. On such a finding the doctrine of res ipsa loquitur would apply. On the other hand, if those acts and omissions were accepted by the jury as being the proximate cause of the collapse of the box, no inference could be drawn that the carrier was negligent in handling the box.
(8) The issue must be resolved, therefore, in accordance with the following principles: "In considering the applicability of res ipsa, it is not for the trial court to ascertain whether a defendant's negligence is the more likely explanation of the accident. The court merely determines whether the plaintiff has produced sufficient substantial evidence to permit a jury to draw such an inference. Where reasonable men may differ as to the balance of probabilities, the trial judge must leave the question to the jury [citations]. (9) Where, as here, there is evidence that would support the application of res ipsa loquitur, the granting of a nonsuit is erroneous [citations]. (5d) The jury, under appropriate contingent instructions, should have been permitted to conclude whether the three factual conditions of the doctrine had been met [citations]." (Gherna v. Ford Motor Co., supra, 246 Cal. App.2d at p. 649. See also, Shahinian v. McCormick, supra, 59 Cal.2d 554, 561. Cf., Quintal v. Laurel Grove Hospital, supra, 62 Cal.2d 154, 166; Borenkraut v. Whitten, supra, 56 Cal.2d 538, 547; Guerra v. Handlery Hotels, Inc., supra, 53 Cal.2d 266, 271; Wolfsmith v. Marsh, supra, 51 Cal.2d 832, 836; Seneris v. Haas, supra, 45 Cal.2d 811, 826-827; Casetta v. United States Rubber Co., supra, 260 Cal. App.2d 792, 810; Gherna v. Ford Motor Co., supra, 246 Cal. App.2d 639, 648-649; Crawford v. County of Sacramento (1966) 239 Cal. App.2d 791, 797 [49 Cal. Rptr. 115]; Hansen v. Matich Corp., supra, 234 Cal. App.2d 129, 133-135; Greening v. General Air-Conditioning Corp., supra, 233 Cal. App.2d 545, 553; Exploration Drilling Co. v. Heavy Transport, Inc., supra, 220 Cal. App.2d 397, 403 and 404-407; Reynolds v. National Gas Equipment, Inc., supra, 184 Cal. App.2d 724, 735; Keller v. Morrison-Knudsen Co., Inc., supra, 149 Cal. App.2d 205, 211-214; Rodin v. American Can Co. (1955) 133 Cal. App.2d 524, 531 [284 P.2d 530]; Baker v. B.F. Goodrich Co., supra, 115 Cal. App.2d 221, 229-230. Cf., however, LaPorte v. Houston, supra, 33 Cal.2d 167, 170; Casetta v. United States Rubber Co., supra, *475 260 Cal. App.2d 792, 816; Crawford v. County of Sacramento, supra, 239 Cal. App.2d 791, 798-799.)
In Fowler v. Seaton, supra, the court observed, "It must be remembered that, at this stage of the proceedings, we are involved solely with the question of whether the plaintiff has offered to prove a circumstantial case that should have gone to the jury. As pointed out, this depends on the reasonable probabilities. Is it more reasonable than not, where a sound, healthy child is delivered to the custody of defendant, and a badly damaged child with concussion of the brain is delivered back, that defendant was negligent in her supervision, when the defendant, when faced with the physical facts, which she had not volunteered, gave a false explanation?" (61 Cal.2d at p. 689.) In this case there is no suggestion of any false explanation. Nevertheless, the trier of fact was entitled to consider that the collapsed box was last in the custody of the defendant's employees, subject to their examination, and that their failure to preserve it, with knowledge that it was a causative agent of an injury, contributed to the uncertainty of proof at the trial. (See, Dierman v. Providence Hospital (1947) 31 Cal.2d 290, 293 [188 P.2d 12]; and Biondini v. Amship Corp., supra, 81 Cal. App.2d 751, 768.)

Negligent Mishandling
"A carrier of property for reward must use at least ordinary care and diligence in the performance of all his duties...." (Civ. Code, § 2114, portion.)[3]
(10) "Negligence may be established by circumstantial evidence, which is nothing more than one or more inferences which may be said to arise reasonably from a series of proven facts. A plaintiff relying on circumstantial evidence does not have to exclude the possibility of every other reasonable inference possibly deriving from the evidence. [Citations.]" (Sparks v. Allen Northridge Market (1959) 176 Cal. App.2d 694, 699 *476 [1 Cal. Rptr. 595]. See also, Truck Ins. Exchange v. Stilley (1963) 213 Cal. App.2d 311, 323 [28 Cal. Rptr. 588].)
"The inferences resulting from the application of the doctrine of res ipsa loquitur are but a form of circumstantial evidence. The use of that battered and somewhat ambiguous phrase does not change the fact that what we are talking about is a special application of the rules surrounding the use and weight of circumstantial evidence (Prosser on Torts (3d ed. 1964) p. 217), and that the doctrine is applicable to nonjury as well as jury cases." (Seeley v. Combs, supra, 65 Cal.2d 127, 130.)
In Rose v. Melody Lane, supra, the court concluded, "The doctrine of res ipsa loquitur concerns a type of circumstantial evidence upon which plaintiff may rely to discharge his burden of proving defendant's negligence. Such evidence was given to the jury in this case. The nature of the accident and the fact that defendant and its agents were the only persons whose negligence could have been involved give rise to the inference that defendant was negligent. There is no reason why the jury may not draw that inference without, as well as with, a specific instruction authorizing them to do so." (39 Cal.2d at p. 488.)
(11) The same evidence discussed above in connection with the application of the doctrine of res ipsa loquitur would, therefore, support a finding of negligence under the principles last cited. The jury could find that the box was delivered in good condition, and that by mishandling its structure was weakened so that it was no longer able to perform the function for which it was designed, and which it successfully fulfilled in the trip from the consignor's plant and its delivery to the carrier.

Negligent Acceptance of the Box
(12a) The plaintiff introduced in evidence a copy of the Pacific Greyhound Local Interdivision on Joint Express Tariff Number Z-14-A which had been filed with the state Public Utilities Commission. The carrier's general baggage and express agent testified that the tariff outlined the conditions under which the carrier would accept express in April 1964.[4] The tariff contained the following provision relating to the manner in which express should be packaged: "All shipments must be packed in containers made of material of such strength and durability and quality to withstand the handling, piling, strapping and rubbing on or in baggage compartment or rack incident to its transportation over the highway by bus, and carriers *477 parties to this tariff will not accept for handling shipments not so properly packed."
The testimony of the San Mateo station agent was to the effect that the box should have been packaged better, with more than just nails  with metal straps around it  to hold the heavy weight. He stated that the box was "flimsy" and was not heavy enough for the items shipped in it. Plaintiff contends that this testimony is sufficient to sustain a finding that the Santa Clara station agent received the box in violation of the conditions set forth in the tariff, and warrants the conclusion that the carrier was negligent in accepting the box in the condition in which it was delivered.
The carrier asserts that the testimony upon which the plaintiff relies on this theory of this case merely shows that it was possible to diagnose the inadequacy of the box after it came apart, and that any weakness or structural defect was latent and could be only discovered then. The testimony, however, permits the inference that the box should have been rejected for shipment in the condition in which it was received.
The carrier contends as a matter of law that the statement in its tariffs is not intended to impose any duty of care upon it, but is designed to properly qualify its obligation to accept freight. (See, Civ. Code, § 2169.[5]) It is unnecessary to determine the extent, if any, that the filing of an approved tariff with a regulatory agency endows the provisions of the tariff with the same attributes as a law or regulation. (Cf. United States v. Savage Truck Lines, Inc. (4th Cir.1953) 209 F.2d 442 [44 A.L.R.2d 984] [cert. den. (1954) 347 U.S. 952 [98 L.Ed. 1098, 74 S.Ct. 677]]; Wintersteen v. National Cooperage & Woodenware Co. (1935) 361 Ill. 95, 102 [197 N.E. 578, 582]; Porter v. Montgomery Ward & Co., Inc. (1957) 48 Cal.2d 846, 849 [313 P.2d 854]; Ross v. Kirby (1967) 251 Cal. App.2d 267, 271-272 [59 Cal. Rptr. 601]; Williams v. Lambert (1962) 201 Cal. App.2d 115, 118-119 [19 Cal. Rptr. 728]; Longway v. McCall (1960) 181 Cal. App.2d 723, 727 [5 Cal. Rptr. 818].) The standards in the tariff are designed to protect the carrier from the risk of claims for damage suffered in transit by goods which have been improperly packed, and for damage to other goods or persons suffered because of the escape of the contents of inadequate containers. If the Santa Clara agent who received the box was negligent in performing his duty to inspect and reject the box in order to protect his *478 employer from the consequences of receiving and transporting goods in defective packages, he and his employer, under the doctrine of respondeat superior, were also negligent to all those who would foreseeably be injured by the collapse of the defective package upon delivery. (See, Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal.2d 850, 864-865 [73 Cal. Rptr. 369, 447 P.2d 609]; and Biakanja v. Irving (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; but cf. Bradler v. Craig (1969) 274 Cal. App.2d 466, 473-476 [79 Cal. Rptr. 401].) The class of persons entitled to such protection includes the consignee. (See Fouraker v. Hill & Morton, Inc. (1958) 162 Cal. App.2d 668, 673 [328 P.2d 527]; Owen v. Rheem Mfg. Co. (1947) 83 Cal. App.2d 42, 46-48 [187 P.2d 785]; and Wintersteen v. National Cooperage & Woodenware Co., supra, 361 Ill. 95, 103 [197 N.E. 578, 582].)
(13) In cases in which the shipper loads the conveyance furnished by the carrier, the following rule applies: "The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper." (United States v. Savage Truck Line, Inc., supra, 209 F.2d 442, 445. See also, Fouraker v. Hill & Morton, Inc., supra, 162 Cal. App.2d 668, 673; Owen v. Rheem Mfg. Co., supra, 83 Cal. App.2d 42, 46-48; and Wintersteen v. National Cooperage & Woodenware, supra, 361 Ill. 95, 103 [197 N.E. 578, 582].) The same principles should govern the liability for goods inadequately packaged which are received by the carrier.
(12b) The carrier insists that any defects were latent and concealed (see Civ. Code, § 2194, subd. 1, fn. 3 above), but, as noted above, the testimony permitted conflicting inferences on that issue. It also contends that the judgment in favor of Gehrke requires a finding that the box was not defective when shipped or that the plaintiff himself was responsible for its inadequacy. This is not a case where any judgment in favor of Gehrke would necessarily preclude a judgment against the carrier. (Cf. Zeppi v. Beach (1964) 229 Cal. App.2d 152, 157-161 [40 Cal. Rptr. 183]; with Walnut Creek Aggregates Co. v. Testing Engineers, Inc. (1967) 248 Cal. App.2d 690, 698-699 [56 Cal. Rptr. 700].) The evidence, disregarding that introduced after the grant of the nonsuit (see fn. 2 above), would permit a finding that Gehrke tendered what to him reasonably was a proper package for shipment, but that the carrier with superior knowledge of "the handling, piling, strapping, and rubbing" to which the box would be exposed should have rejected it *479 until it was secured with metal straps. The plaintiff was entitled to submit this theory of the case to the jury.
The judgment for Gehrke suggests that the jury may well have found that the accident occurred from inherent defects in a box constructed by the plaintiff's agents, and that the weight of the evidence points to this conclusion. It is not the function of this court to weigh the evidence which was not in fact passed upon by the jury in connection with the liability of the carrier. As noted above, a verdict against the carrier would not only be sustained by the evidence, but also could be consistent with a verdict in favor of Gehrke. The court erred in granting a nonsuit.
The judgment of nonsuit is reversed.
Molinari, P.J., and Caldecott, J.,[*] concurred.
NOTES
[*] Reporter's Note: This case was previously entitled "Albers v. Gehrke."
[1] The action continued against the consignor and resulted in jury verdict and judgment in his favor. Plaintiff originally appealed from this judgment also, but abandoned the appeal in his opening brief and subsequently dismissed it.
[2] The carrier stresses the testimony of Gehrke that he returned the cutters in the same container in which they came, and it argues that the box was therefore originally under the control of plaintiff as his product. After the nonsuit was granted to the carrier, the plaintiff was further cross-examined by the defendant Gehrke concerning the origin and nature of any box in which the cutters might have been shipped to Gehrke. Gehrke testified that he never built a box to transport the cutters, and reiterated that they were sent back in the box in which they came. The testimony received after the nonsuit cannot be considered in determining the propriety of the ruling on the motion for that relief, and the state of the evidence at that stage of the case did not establish as a matter of law that the box originated with plaintiff.
[3] Civil Code section 2194 provides: "Unless the consignor accompanies the freight and retains exclusive control thereof, an inland common carrier of property is liable from the time that he accepts until he relieves himself from liability pursuant to Sections 2118 [by delivery] to 2122 [repealed], for the loss or injury thereof from any cause whatever, except:

"1. An inherent defect, vice, or weakness, or a spontaneous action, of the property itself;
"2. The act of a public enemy of the United States, or of this State;
"3. The act of the law; or,
"4. Any irresistable superhuman cause."
Civil Code section 2195 provides: "A common carrier is liable, even in the cases excepted by the last section, if his want of ordinary care exposes the property to the cause of the loss."
[4] As of December 1964, a new tariff was created, which states the shipper warrants that the shipments are properly packed or packaged; no such tariff was in existence at the time of the accident.
[5] Civil Code section 2169 provides: "A common carrier must, if able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry." See also, California Powder Works v. Atlantic & Pac. R.R. Co. (1896) 113 Cal. 329, 335 [45 P. 691, 36 L.R.A. 648], wherein it is stated, "A common carrier is not bound to receive goods which are so defectively packed that their condition will entail upon the company extra care and extra risk;..."
[*] Assigned by the Chairman of the Judicial Council.